**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARIA AGUILAR-MOYA,<br><br>Defendant. | Case No. 17-cr-00015-BLF-1<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS INDICTMENT**<br><br>[Re: ECF 39] |

Defendant Maria Aguilar-Moya is charged in a single-count Indictment for violating 8 U.S.C. §§ 1326(a), which prohibits illegally re-entering the United States after being removed or deported. *See* Indictment, ECF 1. Aguilar-Moya moves to dismiss the Indictment on the grounds that her prior removal order was unlawful and cannot serve as the predicate for this illegal reentry prosecution. *See* Mot. at 1, ECF 39. The Court has considered the parties' briefing, the evidentiary record, oral argument presented at the hearing on July 31, 2018, and the applicable law. For the reasons that follow, the Court finds that Aguilar-Moya has satisfied the requirements for collaterally attacking her 2013 removal order under 8 U.S.C. § 1326(d), and GRANTS her motion to dismiss the Indictment.

**I.    BACKGROUND**

**A.    Childhood and Early Life**

Aguilar-Moya is a citizen of Mexico who came to the United States in 1989 to live with her mother when she was fourteen years old. *See* Declaration of Maria Aguilar-Moya ("Aguilar-Moya Decl.") ¶ 2, ECF 39-1. Aguilar-Moya had a difficult childhood, including a relationship with her father marked by abuse and neglect. *See* Psychological Evaluation by Dr. Jane Christmas ("Christmas Report"), Def. Exh. I, ECF 39-10. Aguilar-Moya recalls an incident when she was seven years old when her father tried to hit her with a whip. When she started to run away, her father pulled his gun out of his pocket and ran after her, shooting at her legs. *Id.* ¶ 17.

At age nineteen, Aguilar-Moya became pregnant with her first child, who is a United States citizen. *Id.* ¶ 27; Aguilar-Moya Decl. ¶ 3. Twelve years later, in 2006, Aguilar-Moya gave birth to her second child who is also a United States citizen. Christmas Report ¶ 32; Aguilar-Moya Decl. ¶ 3. At that point, Aguilar-Moya became a victim of domestic violence at the hands of the father of her second child, who hit, punched, and kicked her, leaving her bruised and bloodied. Christmas Report ¶¶ 32-33. Once, he tried to hit Aguilar-Moya in the face with a glass lightbulb. *See* Declaration of Helen Lawrence ("Lawrence Decl.") ¶ 4(d), Def. Exh. H, ECF 39-9. Aguilar-Moya remained in this abusive relationship for nearly eight years. Christmas Report ¶ 36. At least once, Aguilar-Moya reported the domestic violence to the police. Lawrence Decl. ¶ 4(d).

In January 2009, a man unknown to Aguilar-Moya broke into her two-bedroom trailer and held Aguilar-Moya at gunpoint in front of her young child. Christmas Report ¶ 34. Aguilar-Moya managed to escape and call the police, who ultimately found the perpetrator. *Id.* ¶ 35. Based on Aguilar-Moya's reporting of the crime, two men were charged with multiple counts and enhancements including first degree burglary, first degree robbery, attempted kidnapping, and assault with a deadly weapon. Lawrence Decl. ¶ 4(e). Aguilar-Moya testified at the preliminary hearing and her attacker pled guilty to first degree attempted robbery. *Id.* As a result of these harrowing experiences, Aguilar-Moya has been diagnosed with Post-Traumatic Stress Disorder ("PTSD") and Major Depressive Disorder with chronic symptoms. *Id.*; Christmas Report ¶¶ 51-96.

### B. 2013 Removal Proceedings

On or about September 17, 2012, Aguilar-Moya was convicted of felony possession for sale of a controlled substance – methamphetamine, in violation of California Health & Safety Code § 11378. *See* Lawrence Decl. ¶ 4(f). This conviction brought Aguilar-Moya to the attention of the Department of Homeland Security ("DHS"). *Id.* ¶ 4(h). In the early morning of May 17, 2013, several DHS Immigration and Customs Enforcement ("ICE") officers arrived at the home of Aguilar-Moya's mother, where Aguilar Moya was living at the time. Aguilar-Moya Decl. ¶ 5. When asked, Aguilar-Moya gave the officers her name, and was immediately taken out of the house. *Id.* ¶ 6. Aguilar-Moya declares that the ICE officers told her that they had an immigration

warrant for her arrest based on her prior drug conviction, but they did not show her the warrant or any other papers. *Id.*

Aguilar-Moya recalls that one of her brothers, who was also living at the house, told her that he would call a lawyer right away. *Id*. ¶ 8. Aguilar-Moya's brother told the ICE officers that he was going to get a lawyer for her. *Id.* The ICE officers then took Aguilar-Moya to an Immigration Office nearby, where she immediately asked an ICE officer if she could have a lawyer. *Id.* ¶ 10. ICE Officer Jesse Cruz ("Officer Cruz") administered Aguilar-Moya's removal proceedings. *See* Declaration of Courtney Norris ("Norris Decl.") at 2, ECF 43-1. Aguilar-Moya testifies in her declaration that Officer Cruz told her that a lawyer would not "waste his time working on my case" because of her prior drug conviction, and that there was not enough time for Aguilar-Moya to get a lawyer because she had to be on a bus to Mexico soon. Aguilar-Moya Decl. ¶ 11.

Shortly after that exchange, Officer Cruz came back into the room with a stack of papers and told Aguilar-Moya that she needed to sign them before she got on the bus to Mexico. *Id*. ¶ 12. Officer Cruz did not review the documents or read the forms to Aguilar-Moya in either Spanish or English. Rather, Aguilar-Moya declares that Officer Cruz pointed to the spots on the documents, such as the "Record of Sworn Statement," where she needed to sign or answer questions, and she complied. *Id.* at ¶ 14. Officer Cruz never reviewed or read the following documents to Aguilar-Moya: the I-851 forms (including the Notice of Intent to Issue a Final Administrative Removal Order and the Final Administrative Removal Order), the form entitled "Declaración de Derechos" or the "Warrant for Arrest of Alien" form. *Id.* ¶¶ 14-20; Def. Exh. B (I-851 and I-851A forms); Def. Exh. C ("Declaración de Derechos"); Def. Exh. D (Warrant for Arrest).[1] Aguilar-Moya declares that she was not aware on May 17, 2013 that she had a right to contest the removal process, a right to appeal, and a right to hire a lawyer. Aguilar-Moya Decl. ¶ 21.

---

[1] At some point, Aguilar-Moya was asked to sign a "Care and Custody of Minor Children" form. Def. Exh. E, ECF 39-6. Officer Cruz explained the purpose of the form was so that Aguilar-Moya's minor daughter could stay with her mother. Aguilar-Moya states that she understood the consequences of signing this form. *See* Aguilar-Moya Decl. ¶ 25.

3

After she signed the forms without having the documents reviewed or read to her, Aguilar-Moya asked Officer Cruz if she could call home to see if her family had found a lawyer for her. *Id.* ¶ 22. Officer Cruz told her she could call home, but that a lawyer would not be able to make it in time before the bus left for Mexico. *Id.* The record shows that Aguilar-Moya made a phone call to her mother from the ICE Office on May 17, 2013. *See* Def. Exh. J, ECF 39-11. Aguilar-Moya declares that her mother informed her that her brother was in the process of getting her a lawyer. Aguilar-Moya Decl. ¶ 23. After the call, Aguilar-Moya informed Officer Cruz that she wanted a lawyer and that her brother was in the process of getting her one. *Id.* ¶ 24. Officer Cruz repeated that a lawyer would not be able to make it in time before the bus left. *Id.*

Several hours after Aguilar-Moya was arrested, she left the Immigration Office by bus for Mexico. *Id.* ¶ 26. Once she arrived in Mexico, Aguilar-Moya spoke to her brother by phone. Her brother told her that after she had called home, he had called the Immigration Office to tell them that he had gotten a lawyer. *Id.* ¶ 27. The Immigration Office told her brother that it was too late for a lawyer because Aguilar-Moya had already signed the papers. *Id.*

The Government's evidence does not contradict Aguilar-Moya's account of the events following her arrest on May 17, 2013. The Government submits evidence that Officer Cruz was a native Spanish speaker. *See* Norris Decl. at 3. Moreover, the declaration of ICE Supervising Officer Courtney Norris provides that it is standard pattern and practice at ICE to serve I-851 forms and a Statement of Rights in a language that the alien understands. *Id.* at 2. Officer Norris reviewed the documents in question and states that they all contain Aguilar-Moya's signature and notes that she did not check the box "I Wish to Contest and/or to Request Withholding of Removal." *Id.* at 3. Aguilar-Moya admits that she signed the documents at the instruction of Officer Cruz. *See* Aguilar-Moya Decl. ¶¶ 14, 16, 18, 22. Notably, the Government does not provide any declaration from Officer Cruz, and Officer Norris does not purport to have personal knowledge of what occurred during Aguilar-Moya's administrative removal proceedings.

On June 7, 2013, Aguilar-Moya attempted to reenter the United States with a fake document and her deportation was reinstated. Lawrence Decl. ¶ 4(i). She was not charged with illegal reentry at that time. *Id.* At some point after being deported, Aguilar-Moya reentered the

4

United States and was charged on January 12, 2017 with one count of violating 8 U.S.C. §§ 1326(a) by illegally reentering this country without the permission of the Attorney General or the Secretary of Homeland Security. *See* ECF 1. Aguilar-Moya moves to dismiss the Indictment on the grounds that her prior removal order in 2013 was unlawful and cannot be the predicate for the Section 1326 charge. *See generally* Mot.

At oral argument on July 31, 2018, the parties agreed to submit on their papers and stated that an evidentiary hearing was unnecessary unless the Court found it helpful. As discussed below, the Court finds that the Government has failed to contradict the evidence submitted by Aguilar-Moya and an evidentiary hearing is not necessary to determine credibility. Although the Court learned at oral argument that Officer Cruz apparently still works for the Government, Officer Cruz did not submit a declaration or attend the hearing. The Government's offer to have Officer Cruz testify at an evidentiary hearing in order to assist the Court is too little too late. Despite many opportunities to do so, the Government has not provided the Court with any information regarding Cruz's account of events. Aguilar-Moya's declaration is not only uncontradicted, it is supported by independent evidence in the record, as discussed below.

## II. LEGAL STANDARD

"For a defendant to be convicted of illegal reentry under 8 U.S.C. § 1326, the Government must establish that the defendant left the United States under order of exclusion, deportation, or removal, and then illegally reentered." *United States v. Raya-Vaca*, 771 F.3d 1195, 1201 (9th Cir. 2014) (internal quotation marks and citation omitted). "A defendant charged under § 1326 has a due process right to collaterally attack [her] removal order because the removal order serves as a predicate element of [her] conviction." *Id.* (internal quotation marks and citation omitted). That right is codified at 8 U.S.C. § 1326(d). *See United States v. Cisneros-Rodriguez*, 813 F.3d 748, 755 (9th Cir. 2015).

To mount a successful challenge to an Indictment under § 1326, a defendant must satisfy 8 U.S.C. § 1326(d), which sets forth three requirements for collaterally attacking the underlying deportation order in a Section 1326 case. The defendant must show that he or she (1) has exhausted administrative remedies to appeal her removal order; (2) was deprived of the

opportunity for judicial review; and (3) that the entry of the removal order was fundamentally unfair. *See Raya-Vaca*, 771 F.3d at 1201 (citing 8 U.S.C. § 1326(d)).

Aguilar-Moya asserts that the third question, whether the entry of the removal order was "fundamentally unfair," is dispositive. *See* Mot. at 5 (citing *Cisneros-Rodriguez*, 813 F.3d at 756); The Government does not explicitly address the exhaustion and deprivation requirements in its opposition. *See generally* Opp'n; Reply at 15, ECF 44. The law is clear that if Aguilar-Moya demonstrates the third requirement under § 1326(d) then the first two requirements are also met. *See Cisneros-Rodriguez*, 813 F.3d at 756; *see also United States v. Gomez,* 757 F.3d 885, 892 (9th Cir. 2014) (noting that "[a] defendant can establish the first two prongs of § 1326(d) by showing that he was denied judicial review of his removal proceeding in violation of due process"); *United States v. Ubaldo–Figueroa,* 364 F.3d 1042, 1049-1050 (9th Cir. 2004).

To satisfy the third requirement that an underlying removal order is "fundamentally unfair," the defendant bears the burden of establishing both that the deportation process violated her due process rights and that the violation caused prejudice. *Raya-Vaca*, 771 F.3d at 1201-02. The second requirement of § 1326(d)(3), that the defendant suffered prejudice, can be met by showing "that [she] had a 'plausible' ground for relief from deportation." *Ubaldo–Figueroa,* 364 F.3d at 1050. Accordingly, if Aguilar-Moya's removal order was entered in violation of her due process rights and if she suffered prejudice as a result of the defects, she is deemed to have "exhausted all administrative remedies available to [her]" and to have been "deprived…of the opportunity for judicial review." *Cisneros-Rodriguez*, 813 F.3d at 756. Moreover, if Aguilar- satisfies all three requirements of § 1326(d)(3), she has successfully collaterally attacked the predicate removal order and the illegal reentry Indictment must be dismissed. *Id.* at 748.

**III.    DISCUSSION**

    **A.    The Entry of the 2013 Removal Order was Fundamentally Unfair**

Section 1326(d)'s third requirement has two parts: Aguilar-Moya must first show that the deportation process violated her due process rights, and second, that the violation prejudiced her. *See Raya-Vaca*, 771 F.3d at 1201-02. For the reasons that follow, the Court finds that Aguilar-Moya has satisfied both parts of Section 1326(d)(3).

### 1. Due Process Violation

Aguilar-Moya argues that the 2013 administrative removal proceeding violated her due process rights because it violated her right to counsel. *See* Mot. at 6. Aliens have a statutory and constitutional due process right to an attorney in immigration proceedings at no cost to the government. *See* 8 U.S.C. § 1228(b)(2) ("the Attorney General shall make reasonable efforts to ensure that the alien's access to counsel and right to counsel under section 1362 of this title are not impaired."); *see also* 8 U.S.C. § 1228(b)(4)(B) ("the alien shall have the privilege of being represented (at no expense to the government) by such counsel, authorized to practice in such proceedings, as the alien shall choose"). "Although there is no Sixth Amendment right to counsel in an immigration hearing, Congress has recognized it among the rights stemming from the Fifth Amendment guarantee of due process that adhere to individuals that are the subject of removal proceedings." *Ram v. Mukasey*, 529 F.3d 1238, 1241 (9th Cir. 2008) (*Tawadrus v. Ashcroft,* 364 F.3d 1099, 1103 (9th Cir. 2004)).

Accordingly, an alien cannot appear pro se in removal proceedings without a knowing and voluntary waiver of the right to counsel. *See Ram*, 529 F.3d at 1242. The Government bears the burden of proving a knowing and valid waiver in a defendant's collateral attack of the underlying removal proceedings. *Cisneros-Rodriguez*, 813 F.3d at 757 (citing U*nited States v. Ramos*, 623 F.3d 672, 680 (9th Cir. 2010)). The Court must "indulge every reasonable presumption against waiver," particularly when it is an uncounseled individual who is waiving her rights. *Id.* (citing *United States v. Gomez*, 757 F.3d 885, 892 (9th Cir. 2014).

The Government argues that Aguilar-Moya signed a knowing and voluntary waiver of her right to counsel in Spanish. *See* Opp'n at 3 (citing Declaración de Derechos, Def. Exh. C, ECF 39-4). Aguilar-Moya admits that she signed the document, but argues that her signature was not a knowing and voluntary waiver of her right to counsel because she did not understand that she had this right based on Officer Cruz's conduct during her removal proceedings. Mot. at 7. Standing alone, an alien's signature on a document is insufficient to establish a knowing and intelligent waiver of rights. *See United States v. Gomez*, 732 F.3d 971, 980 (9th Cir. 2013); *United States v. Reyes-Bonilla*, 671 F.3d 1036, 1043-45 (9th Cir. 2012); *see also United States v. Ramos*, 623 F.3d

672, 682 (9th Cir. 2010) ("[t]he key question is whether a waiver is 'knowing and voluntary,' not whether it is verbal or written."). Although Aguilar-Moya signed the documents waiving her right to counsel, she declares that Officer Cruz did not read the forms to her and did not explain that the forms meant that she was giving up her right to counsel or any other right. Aguilar-Moya Decl. ¶¶ 16, 18. The Government argues that she could have read the documents herself because they were in Spanish, but Aguilar-Moya testified that she never personally reviewed the forms. *Id.* Instead, she declares that Officer Cruz simply pointed to spaces where she needed to answer questions and sign. *Id.*

Aguilar-Moya further admits that she signed the I-851 form regarding Notice of Intent to Deport/Remove, but similarly declares that Officer Cruz did not read the form to her in English or Spanish, nor did he explain the document or the consequences of signing it. *Id.* ¶ 16. Officer Cruz pointed to where Aguilar-Moya needed to sign the form and to where she should check boxes and write in "Mexico." *Id.* The only evidence submitted by the Government to rebut this testimony is that Officer Cruz is fluent in Spanish and it was standard practice for ICE Officers to explain the I-851 form in a language the alien can understand—here, Spanish. *See* Norris Decl. at 2. The Court accepts that Aguilar-Moya's signature appears on these documents, that Officer Cruz was fluent in Spanish, and that ICE Officers are trained to review the forms with aliens in their native language. This evidence, however, does not rebut Aguilar-Moya's assertions about the specific circumstances of her case. Officer Norris has no personal knowledge of what happened on May 17, 2013, and Officer Cruz is silent on the issue. Accordingly, the Court finds that Aguilar-Moya has demonstrated that her right to counsel was not explained to her during her 2013 removal proceedings, and her waiver of rights was not knowing and voluntary.

Aguilar-Moya has further shown that Officer Cruz affirmatively misadvised her regarding her right to counsel by telling her that no lawyer would want her case due to her past felony conviction, and that there was "not enough time for a lawyer" because she had to be on the bus to Mexico soon. *See* Aguilar-Moya Decl. ¶ 11. A waiver of the right to counsel is not constitutionally valid in circumstances where an ICE officer misleads an uncounseled alien about her right to counsel. *Cisneros-Rodriguez*, 813 F. 3d at 757 ("We hold that if an ICE agent

erroneously advises an uncounseled alien in an administrative removal proceeding that an attorney will not be able to provide assistance, any waiver of the right to counsel based on that advice is invalid because it is not 'considered and intelligent.'"). In addition to not having the documents read or explained to her, Aguilar-Moya has shown that she requested an attorney several times during her removal proceedings and Officer Cruz misadvised by stating that no lawyer would take her case and that no lawyer would make it before the bus left. Aguilar-Moya Decl. ¶¶ 10, 22, 24.

Two pieces of independent evidence in the record corroborate Aguilar-Moya's testimony that her family was attempting to secure a lawyer for her: (1) the record of Aguilar-Moya's telephone call to her mother from the Immigration Office during the removal process, Def. Exh. J; and (2) an immigration attorney intake form demonstrating that Aguilar-Moya's brother contacted a lawyer about representing her on May 17, 2013, Def. Exh. F. The Government attempts to draw the Court's attention away from this corroborating evidence, and points out that the immigration attorney's worksheet indicates that Aguilar-Moya's sibling are using the law firm to file U-visa applications. *See* Opp'n at 4; Def. Exh. F. As discussed below regarding prejudice, the fact that Aguilar-Moya may have been aware of the possibility of applying for a U-visa does not mean she has failed to show prejudice. Moreover, that her siblings were applying for U-visas does nothing to cast doubt on the truth of Aguilar-Moya's assertion that Officer Cruz told her that she did not have time to consult an attorney when she informed him that she wanted an attorney and her brother was attempting to secure one for her.

Even if the Court disregards Aguilar-Moya's uncontested statements about what Officer Cruz told her, the fact that her family immediately called an immigration lawyer and she was already on a bus to Mexico by the time her brother secured one a few hours later, supports a finding that her due process right to counsel was violated. Other than Aguilar-Moya's signature on the documents, which she admits she signed, the Government has put forth no evidence that Aguilar-Moya's waiver of her right to counsel was considered and intelligent. This is far from the "clear and convincing" evidence required to show a knowing and voluntary waiver of a fundamental right. *United States v. Pallares-Galan*, 359 F.3d 1088, 1097 (9th Cir. 2004) ("For a waiver to be valid, the government must establish by 'clear and convincing evidence,' that the

9

waiver is 'considered and intelligent.'") (internal citations omitted). Instead, the record shows that Aguilar-Moya did not understand her right to counsel on May 17, 2013, and did not understand the legal consequences of signing the forms. Her signature therefore does not constitute a valid waiver of her rights.

For these reasons, Aguilar-Moya has satisfied her burden under Section 1326(d)(3) to show a due process violation based on her unknowing and involuntary waiver of counsel. The Court next considers whether Aguilar-Moya suffered prejudice as a result of the violation.

### 2. Prejudice

Aguilar-Moya has also satisfied the prejudice aspect of the third prong of § 1326(d)'s inquiry. To establish prejudice, Aguilar-Moya "does not have to show that [she] actually would have been granted relief. Instead, [she] must only show that [she] had a 'plausible' ground for relief from deportation." *Ubaldo-Figueroa*, 364 F.3d at 1050. "Establishing plausibility requires more than establishing a mere possibility." *Cisneros-Rodriguez*, 813 F.3d at 761 (internal quotation marks, citation, and brackets omitted). However, relief need not be "probable." *Id.* (citing *Raya-Vaca*, 771 F.3d at 1207). Thus, Aguilar-Moya "needs to show that relief was more than 'possible,' but she need not show that it was 'probable.'" *Id.* The burden is not a heavy one – the defendant "need only establish some evidentiary basis on which relief could have been granted." *Raya-Vaca*, 771 F.3d at 1207.

Aguilar-Moya argues that she was prejudiced because "but for" the due process violation, it is "plausible" that she would have been permitted to apply for a U-visa and that she would have obtained one had she applied. *See* Mot. at 10. In particular, Aguilar-Moya contends that relief was plausible because she was the victim of assault with a deadly weapon and kidnapping in January 2009 and testified against the perpetrator, securing his conviction. *Id.* The Government argues that based on Aguilar-Moya's criminal history and conviction for an aggravated felony, it is implausible that she would have obtained relief in the form of a U-visa. *See* Opp'n at 6.

Congress created the U-visa for certain victims of criminal activity with the enactment of the Victims of Trafficking and Violence Protection Act of 2000 ("VTVPA"), Pub. L. 106-386, 114 Stat. 1464 (2000); *see also Lee v. Holder*, 599 F.3d 973, 974 (9th Cir. 2010). The U-visa

10

confers temporary nonimmigrant status, employment authorization, and a path to adjustment to lawful permanent resident status. *See* Lawrence Decl. ¶ 5(m); INA § 245(m); 8 C.F.R. § 245.24(b). To establish *prima facie* eligibility for a U-visa, Aguilar-Moya must submit evidentiary proof that she meets the following criteria: (1) she has suffered substantial physical or mental abuse in connection with a qualifying crime; (2) she possesses information concerning the crime; (3) she has been helpful, is being helpful, or is likely to be helpful to an official who is investigating or prosecuting the crime; and (4) the qualifying crime violated federal or state law. *See Cisneros-Rodriguez*, 813 F.3d at 759 (citing 8 U.S.C. § 1101(a)(15)(U)(i)). A U-visa applicant must also obtain a certification from a law enforcement official in order to qualify for the visa. *Id.* (citing 8 C.F.R. § 214.14(c)(2)(i)).

The Government cannot reasonably dispute that Aguilar-Moya meets this criteria.[2] Aguilar-Moya has demonstrated that she was the victim of kidnapping, false imprisonment, and felonious assault with a deadly weapon in 2009, which constitute qualifying crimes. 8 U.S.C. § 1101(a)(15)(U)(iii). Aguilar-Moya clearly suffered abuse in connection with the crime, as demonstrated by her diagnosis of PTSD and depression. *See* Christmas Report ¶¶ 51-96; Lawrence Decl. ¶ 4(e). Aguilar-Moya also rendered substantial assistance in the prosecution of the perpetrator by testifying at the preliminary hearing against her attacker, who ultimately entered a guilty plea and went to jail. *See* Def. Exh. G, ECF 39-8 (state court records); *see also* Lawrence Decl. ¶ 4(e). Although Aguilar-Moya's certification from law enforcement is not yet in the record, defense counsel represented at the July 31, 2018 hearing that the requisite certification concerning the kidnapping was signed on July 6, 2018 and has been mailed to Aguilar-Moya. This confirms the evidence in the record from immigration attorney Helen Lawrence, who reviewed Aguilar-Moya's case and interviewed her, and stated that she was "very confident" that

---

[2] The Government argues that Aguilar-Moya could have applied for a U-visa at any time since 2009, whether she was in Mexico or the United States, but that Aguilar-Moya has not yet done so. *See* Opp'n at 5-6; Carroll Decl. ¶ 11. This argument is unpersuasive, and the Government cites to no law supporting its contention that Aguilar-Moya was required to have already applied for a U-visa in order to establish prejudice. Moreover, defense counsel represents that Aguilar-Moya is currently applying for a U-visa with the assistance of immigration counsel and she has recently been granted the requisite certification, rendering the Government's argument moot.

Aguilar-Moya could obtain a law enforcement certification based on her cooperation in the kidnapping prosecution. Lawrence Decl. ¶ 5(p)-(r). The Court agrees. It is undisputed that Aguilar-Moya reported the crime and testified in Court against the perpetrator, which led to conviction. This conduct makes her clearly eligible for certification.

The law does not require that Aguilar-Moya have the certification in hand to demonstrate prejudice under § 1326(d)—only that she needs the certification in order ultimately to obtain a U-visa. *See, e.g., Cisneros-Rodriguez*, 813 F.3d at 753 (finding that defendant was facially eligible for a U-visa *before* she obtained law enforcement certification, and granting her relief because she could have plausibly obtained one at the time of her removal proceedings); *United States v. Cervantes*, 2016 WL 6472108 (N.D.C.A. August 1, 2016) (granting relief because defendant could have plausibly obtained a U-visa at the time of her removal proceedings with no reference to whether she had subsequently obtained law enforcement certification); *see also United States v. Resuleo-Flores*, 2012 WL 761701 (N.D.C.A. March 7, 2012).

The Government focuses its argument on the requirement that U-visas are only available to individuals who are admissible to the United States, and Aguilar-Moya is not admissible due to her criminal history. Opp'n at 5 (citing 8 C.F.R. § 214.1(a)(3)(i)). The general rule is that a defendant who has been convicted of an aggravated felony "cannot show that [s]he was prejudiced by defects in [her] underlying [removal] proceedings…because noncitizens convicted of aggravated felonies are…ineligible for almost all forms of discretionary relief." *Cisneros-Rodriguez*, 813 F.3d at 759 (quoting United *States v. Alvarado–Pineda,* 774 F.3d 1198, 1201 (9th Cir. 2014)). However, a conviction for an aggravated felony does not necessarily disqualify an applicant from obtaining a U-visa. *Cisneros-Rodriguez*, 813 F.3d at 759. DHS U.S. Citizenship and Immigration Services ("USCIS") may, as a matter of discretion, grant a waiver for most grounds of inadmissibility found in INA § 212(a) with respect to a U-visa applicant if USCIS determines that doing so would be in the public or national interest. *See* 8 C.F.R. §§ 212.17(b)(2), 214.14(c)(2)(iv); *see also* Declaration of Carson Carroll ("Carroll Decl.") ¶ 7, ECF 43-2; Lawrence Decl. ¶ 5(g)-(l).

Applicants who have prior convictions for "violent and dangerous" crimes may also obtain a waiver, although these applicants must demonstrate "extraordinary circumstances," in order to receive a U-visa. 8 C.F.R. § 212.17(b)(2); *see* Carroll Decl. ¶ 9; Lawrence Decl. ¶ 5(t). The Government argues that Aguilar-Moya would need to demonstrate extraordinary circumstances because her September 2012 conviction for felony possession and sale of methamphetamine, in violation of California Health & Safety Code § 11378, is "violent and dangerous." Opp'n at 5 (citing *U.S. v. Garcia*, 909 F.2d 1346, 1350 (9th Cir. 1990); *U.S. v. Willis*, 899 F.2d 873, 875 (9th Cir. 1990); *U.S. v. Johnson*, 886 F.2d 1120, 1123 (9th Cir. 1989); *U.S. v. Watson*, 887 F.2d 980 (9th Cir. 1989)). These federal drug trafficking cases are primarily concerned with sentencing enhancements for violence in cases involving drugs and firearms. The Court finds that this authority does very little to aid a determination that Aguilar-Moya's state conviction for possession with intent to sell drugs constitutes a violent and dangerous crime pursuant to 8 C.F.R. § 212.17(b)(2). The most recent case relied on by the Government is from 1990. The Government did not address the development in this area of law regarding the reduction in sentencing at both the federal and state levels for drug crimes where there is no evidence of actual violence or possession of weapons either in its brief or when pressed by the Court at oral argument. In addition, nothing in the Carroll Declaration indicates that USCIS would have considered Ms. Aguilar-Moya's prior drug conviction to be a "violent or dangerous crime." *See generally* Carroll Decl. In fact, there is no indication that anyone at USCIS has reviewed the records in this case, and the Carroll Declaration is useful only to the extent it provides background about U-visas. Therefore, the Court is not convinced that Aguilar-Moya's conviction was "violent and dangerous," triggering the "extraordinary circumstances" requirement in order to obtain a waiver.

Aguilar-Moya's evidence that she plausibly could have obtained a waiver under a U-visa adjudication is substantial. Several factors would have weighed positively in her waiver application. *See* Lawrence Decl. ¶ 5(t). Aguilar-Moya contends that the § 11378 felony was non-violent in that it did not involve a weapon, and it carried a low sentence. Aguilar-Moya was sentenced to 180 days of home confinement and 3 years of probation, with no jail time. *Id.*

Moreover, because the felony occurred in 2012 after Aguilar-Moya had been victimized, the felony could have been contextualized in light of the 2009 kidnapping. *Id.* Aguilar-Moya's experience as a victim of severe domestic violence is significant because she reported it, and doing so is considered an important public interest. *See id.* Perhaps most importantly, Aguilar-Moya has two children who are U.S. citizens and several other family members who are lawful permanent residents. *Id.*; *see also* Aguilar-Moya Decl. ¶¶ 3-4. There is also evidence that had Aguilar-Moya obtained an immigration attorney in 2013, she could have collaterally attacked her prior felony conviction based on ineffective assistance of counsel. Lawrence Decl. ¶ 5(u).

Lawrence declares that she has represented many individuals who were granted waivers in U-visa applications despite even more extensive criminal histories than Aguilar-Moya. *Id.* ¶ 5(t). Case law further supports the conclusion that Aguilar-Moya's felony does not preclude a finding of prejudice, as courts have found it is still plausible to obtain a U-visa when a defendant has an even more serious criminal history. *See Cervantes*, 2016 WL 6472108, at *4 (finding it plausible that defendant would have obtained a U-visa despite "substantial" criminal record including convictions in a gang-related drug trafficking conspiracy resulting in a sentence of 37 months imprisonment and a 15-year term of supervised release); *see also Cisneros-Rodriguez*, 813 F.3d at 762 (finding it plausible that defendant would have obtained a U-visa despite "substantial criminal record" including a variety of state misdemeanors and felonies).

At oral argument, the Government conceded it was "possible" that Aguilar-Moya would obtain a waiver of inadmissibility for her prior felony, but maintained that it was not "plausible." The Court disagrees. In light of the evidence discussed above, the Court finds it plausible that Aguilar-Moya would have obtained a waiver and relief from deportation in the form of a U-visa in 2013 had she been advised of her rights during her removal proceedings. Aguilar-Moya has demonstrated that "but for" the due process violation, she would have retained counsel—likely through her brother who was attempting to secure an immigration attorney for her—and it is plausible that she would have secured a waiver of inadmissibility for her non-violent drug felony and her U-visa application would have been granted. *Accord* Lawrence Decl. ¶ 5(w) (finding it "very plausible" that Aguilar-Moya would have obtained a U-visa in 2013).

14

For the foregoing reasons, the Court concludes that Aguilar-Moya has satisfied both requirements of § 1326(d)(3) by showing that (1) her due process rights were violated in her removal proceedings; and (2) she was actually prejudiced by the due process violation.

### B. The Remaining § 1326(d) Requirements are Satisfied or Excused

Aguilar-Moya also has the burden to demonstrate that the first two requirements of § 1326(d) are met or excused. This requires a showing that (1) she has exhausted administrative remedies to appeal her removal order; and (2) she was deprived of the opportunity for judicial review. *See Raya-Vaca*, 771 F.3d at 1201 (citing 8 U.S.C. § 1326(d)). By showing that she was denied judicial review of her removal proceedings in violation of due process, Aguilar-Moya has also established these remaining requirements. *See Cisneros-Rodriguez*, 813 F.3d at 756; *see also Gomez,* 757 F.3d at 892; *Ubaldo–Figueroa,* 364 F.3d at 1049-1050.

For the same reasons discussed above regarding Aguilar-Moya's right to counsel, the Court finds that Aguilar-Moya's due process right to appeal was violated during her removal proceedings. "[A]n alien cannot collaterally attack an underlying deportation order if he validly waived the right to appeal that order." *United States v. Ramos*, 623 F.3d 672, 680 (9th Cir. 2010). A valid waiver of the right to appeal must be "considered and intelligent," and the "government bears the burden of proving valid waiver in a collateral attack of the underlying removal proceedings." *Id.* (internal citations omitted). *Ramos* addressed a similar situation to Aguilar-Moya's experience, where the defendant "signed away his right to appeal, to appear before an IJ, and to be represented by counsel in an individual meeting with a deportation officer." 623 F.3d at 681. Here, for example, Aguilar-Moya stated that she did not understand the Notice of Intent form containing her right to appeal, which was written in English and was not read or explained to her. Aguilar-Moya Dec. ¶¶ 1, 16, 21. The Government provides evidence that Officer Cruz speaks fluent Spanish and that ICE Officers generally are trained to read and review the forms in a language the alien understands. None of the evidence submitted by the Government contradicts Aguilar-Moya's account of the May 17, 2013 removal proceedings, including that Officer Cruz did not translate, explain, or review the documents with her and instead pointed to where she should answer questions and sign without advising her of any of her rights.

The Government has completely failed to meet its burden of proving that Aguilar-Moya's signature on the forms waiving her right to appeal was "knowing and voluntary." Aguilar-Moya's waiver of her rights is therefore invalid and does not block her collateral attack in this case. These due process violations also deprived her of judicial review and exempt her from demonstrating that she exhausted her administrative remedies. *See Ubaldo-Figueroa*, 364 F.3d at 1048 (holding that the exhaustion requirement "cannot bar collateral review of a deportation proceeding when the waiver of right to an administrative appeal did not comport with due process."); *see also United States v. Muro-Inclan*, 249 F.3d 1180, 1183 (9th Cir. 2001).

By demonstrating that she was deprived of her due process rights to counsel and to appeal, Aguilar-Moya has satisfied the exhaustion requirement under § 1326(d)(1) and the deprivation requirement under § 1326(d)(2) necessary to collaterally attack the Indictment. *Ubaldo-Figueroa*, 364 F.3d at 1049-50.[3]

## IV. ORDER

Aguilar-Moya has made the requisite showing under each requirement of § 1326(d) to sustain her attack on the underlying removal order. The 2013 removal order therefore cannot constitute a predicate for the current § 1326 charge against her for illegal reentry. Accordingly, Aguilar-Moya is entitled to dismissal of the Indictment and her motion to dismiss the Indictment is GRANTED.

**IT IS SO ORDERED.**

Dated: August 2, 2018

_____
BETH LABSON FREEMAN
United States District Judge

---

[3] Notably, the Government's opposition does not even address the exhaustion and deprivation requirements. *See generally* Opp'n. The Government apparently concedes this argument and stands on the ground that Aguilar-Moya's due process rights were not violated.

16